# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-DP-00189-SCT

*FREDERICK BELL*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/27/93 |
| TRIAL JUDGE: | HON. JAMES C. SUMNER |
| COURT FROM WHICH APPEALED: | GRENADA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | LELAND H. JONES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | AFFIRMED - 6/25/98 |
| MOTION FOR REHEARING FILED: | 8/17/98 |
| MANDATE ISSUED: | 12/28/98 |

**EN BANC.**

**PITTMAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Frederick Bell, known as Freddie, was convicted in the Circuit Court of Grenada County of the capital murder of Robert C. "Bert" Bell and was sentenced to death. Now before us is his appeal of that conviction and sentence. We have carefully considered this appeal and the specific points raised in Bell's briefs, and have reviewed the record in the case for plain and cumulative errors which may have impacted on his right to a fair trial, the conviction and the sentence. We find none and affirm both the conviction and the sentence.

¶2. Frederick Bell and Anthony Joe Doss were indicted on July 19, 1991, for murdering Robert C. "Bert" Bell[1] with malice aforethought while in the commission of the crime of armed robbery, in violation of Miss. Code Ann. § 97-3-19(2)(e) on or about May 6, 1991. Following a trial, on January 26, 1993, the jury rendered its verdict as follows:

> We, the jury, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the capital murder:

1) That the defendant, Frederick Bell actually killed Robert C. "Bert" Bell.

2) That the defendant, Frederick Bell, attempted to kill Robert C. "Bert" Bell.

3) That the defendant, Frederick Bell, intended the killing of Robert C. "Bert" Bell take place.

4) That the defendant, Frederick Bell, contemplated that lethal force would be employed during the commission of the crime of armed robbery.

Next, We, the jury, unanimously find that the aggravating circumstances of:

1) Whether defendant, Frederick Bell, was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person.

2) Whether the capital murder of Robert "Bert" Bell was committed while the defendant was engaged or was an accomplice in the commission of armed robbery.

3) The capital murder of Robert "Bert" Bell was committed for the purpose of avoiding or preventing a lawful arrest.

is/are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstance(s), and we further find unanimously that the Defendant should suffer death.

## THE FACTS

¶3. Sparks' Stop-and-Go is a small grocery store on Cadaretta Road in rural Grenada County. Until the afternoon of May 6, 1991, Bert Bell worked in the store as a clerk. The State's presentation was to the effect that early that afternoon Frederick Bell, Anthony Joe Doss, Robert Kennedy James and Frank Coffey left Coffey's house for the short journey up to Sparks'. Testimony showed that the four of them entered Sparks' and purchased some chips and beer from Bert Bell. They went outside, sat on a picnic table, drank the beer and ate the chips. Bell talked of going to Memphis and said that he needed some money. As they talked, he announced he was going to rob the store and showed the group a .22 caliber pistol which he had in his possession. Doss also had a gun at this point, but, apparently, it would not fire. James and Coffey testified that they refused to take part in the action and departed the scene as Bell and Doss went in the store. A minute or so later, James and Coffey heard gunshots and hollering.

¶4. When Bell and Doss caught up with the other two, they showed them a .38 caliber pistol which they had taken from the store along with a box of bullets and a money bag. At this point, Bell threatened to kill James because he did not want any witnesses. Coffey and Doss stepped in to prevent this. Both James and Coffey testified that Bell said he shot Bert.

¶5. After the incident Bell, Doss and Coffey were taken to Memphis by Bernard Gladney. On the way to Memphis, Bell again said he wanted to kill James to prevent him from telling anyone about the Grenada murder. According to the criminal investigator in charge, two of the guns were recovered from the house where Bell was found in Memphis. The third was found in Gladney's vehicle.

¶6. There was no direct testimony concerning what actually went on in the store, although there was

physical evidence offered by the State. The foregoing narrative is based principally on the testimonies of James and Coffey. Bell maintained at trial and in statements to investigators that he was in Memphis on the day of Bert's murder. There were no corroborating witnesses as to Bell's alibi, and in fact James' sister and Coffey's girlfriend testified that they saw Bell with the rest of the men in Grenada on the day of the tragedy.

¶7. James Shelby Sparks, who owned the grocery, testified that the .38 caliber gun, which was recovered following Bell's arrest in Memphis, a box of shells, and an old money bag were taken from the store during the robbery. The State also showed by ballistic evidence that bullets removed from Bert's body were fired from that gun. The remaining wounds were caused by bullets of a smaller caliber matching the characteristics of a .22. The criminal investigators could not match any of the fingerprints found in the store to Bell.

## THE ISSUES PRESENTED

¶8. In this appeal, Frederick Bell presents sixteen issues for consideration in reviewing the guilt phase of his trial and eleven as to the sentencing phase. Those issues, as stated by the appellant, are as follows.

### GUILT PHASE ISSUES

I. THE VOIR DIRE WAS INADEQUATE TO REVEAL JUROR PREJUDICE WITH THE RESULT THAT BELL WAS DENIED A FAIR AND IMPARTIAL TRIAL AND SENTENCING JURY

A. The jury had disproportionate ties to the victim or law enforcement.

B. Use of leading questions

C. Juror self-assessments

D. Lack of individual voir dire

II. THE TRIAL JUDGE ERRONEOUSLY DENIED BELL'S CHALLENGES FOR CAUSE TO FIVE JURORS.

III. THE TRIAL COURT COMMITTED PLAIN CONSTITUTIONAL ERROR IN EXCUSING WOMEN FROM THE JURY SOLELY BECAUSE THEY HAD SMALL CHILDREN.

IV. THE COURT ERRED IN GIVING INSTRUCTIONS NO. S-2 AND S-3 WHICH ALLOWED BELL TO BE CONVICTED OF CAPITAL MURDER ON FACTS SHOWING ONLY THAT HE WAS AN ACCESSORY AFTER THE FACT.

V. BELL'S CONVICTION MUST BE REVERSED BECAUSE INSTRUCTION S-2 IMPROPERLY ASSUMES THAT A MURDER HAD BEEN COMMITTED.

VI. THE TRIAL COURT ERRED IN REFUSING DEFENDANT'S REQUESTED JURY INSTRUCTION DG-14 WHICH WOULD HAVE TOLD THE JURY TO CONSIDER THE EVIDENCE OF ROBERT JAMES WITH GREAT CARE AND CAUTION.

VII. THE TRIAL COURT ERRED IN REFUSING DEFENDANT'S REQUESTED JURY

INSTRUCTIONS DG-12 AND DG-15 ON THE EFFECT OF IMPEACHED TESTIMONY AND DG-16 ON THE EFFECT OF A PRIOR INCONSISTENT STATEMENT.

VIII. THE COURT COMMITTED REVERSIBLE ERROR IN PROHIBITING BELL FROM IMPEACHING ACCOMPLICE FRANK COFFEY FOR BIAS WITH EVIDENCE THAT HE HAD RECEIVED LENIENT TREATMENT ON A MURDER CHARGE IN MEMPHIS.

IX. THE COURT ERRED IN ALLOWING EVIDENCE THAT THE PROSECUTOR TOLD COFFEY TO TELL THE TRUTH.

X. THE TRIAL COURT ERRED IN OVERRULING BELL'S OBJECTION TO EVIDENCE THAT HE WAS GUILTY OF ANOTHER OFFENSE.

XI. PROSECUTORIAL MISCONDUCT IN THE CLOSING ARGUMENT IN THE GUILT PHASE MANDATES REVERSAL.

A. Good character of the victim

B. Threat to James

C. Lack of remorse

D. Personal opinion and facts not in evidence

XII. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN OVERRULING BELL'S MOTION FOR AN EXPERT.

XIII. THE COURT ERRED IN OVERRULING BELL'S OBJECTION TO EXPERT TESTIMONY ABOUT THE POSITION OF THE DECEASED'S HANDS AT THE TIME A WOUND WAS RECEIVED.

XIV. THE COURT ERRED IN DENYING BELL'S REQUEST TO INSTRUCT ON THE LESSER INCLUDED OFFENSE OF SIMPLE MURDER.

XV. THE COURT COMMITTED PLAIN ERROR IN GIVING INSTRUCTION S-1 AT THE GUILT PHASE WHICH CONSTRUCTIVELY AMENDED THE INDICTMENT.

XVI. THE ADMISSION OF GRUESOME PHOTOGRAPHS OF THE DECEASED DEPRIVED BELL OF A FAIR TRIAL.

<u>SENTENCING PHASE ISSUES</u>

XVII. THE TRIAL COURT COMMITTED PLAIN ERROR IN GRANTING SENTENCING PHASE INSTRUCTION S-1.

A. No evidence to support aggravator that the offense was committed after Bell had previously been convicted of another capital offense.

B. Instructing that the aggravating circumstance that the capital murder was committed during the

course of a robbery could be found if the jury found Bell was an "accomplice in the commission of armed robbery."

C. Allowing the jury to consider the aggravating circumstance of "avoiding or preventing a lawful arrest" where the evidence did not support giving that aggravator.

D. Failure to define "avoiding or preventing a lawful arrest" as an aggravating circumstance.

E. S-1 is erroneous because it has a signature line only under the death option.

F. The instruction also allows for double-counting of the robbery aggravating circumstance.

G. S-1 should not have been granted because it fails to require the jury to make specific written findings of mitigating circumstances.

H. S-1 was erroneously granted because it tells the jury that the mitigating circumstances must outweigh the aggravating circumstances in order to impose a life sentence.

XVIII. BELL'S SENTENCE MUST BE REVERSED BECAUSE THE TRIAL JUDGE DENIED HIS REQUEST TO INSTRUCT THE JURY THAT THE STATE HAD THE BURDEN OF PROVING THAT THE AGGRAVATING CIRCUMSTANCES OUTWEIGHED THE MITIGATING.

XIX. THE JURY FINDINGS ON SENTENCE ARE TOO UNCERTAIN AND UNRELIABLE TO SUPPORT A DEATH SENTENCE.

XX. CUMULATIVE ERROR IN THE PROSECUTOR'S ARGUMENT IN THE SENTENCING PHASE REQUIRES REVERSAL.

XXI. THE TRIAL COURT COMMITTED REVERSIBLE ERROR AT THE SENTENCING PHASE IN ALLOWING TESTIMONY ABOUT BELL'S REPUTATION FOR PEACE AND VIOLENCE WHEN BELL HAD NOT PUT THAT REPUTATION AT ISSUE AND IN ALLOWING THE PROSECUTOR TO ARGUE THAT IT SHOULD BE USED AS AN AGGRAVATING CIRCUMSTANCE.

XXII. THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF THE DETAILS OF BELL'S PRIOR CONVICTION.

XXIII. THE COURT ERRED IN REFUSING BELL'S INSTRUCTIONS DS-6 AND DS-10 THAT TELL JURORS THEY NEED NOT BE UNANIMOUS IN FINDING MITIGATING CIRCUMSTANCES AND IN GIVING INSTRUCTIONS WHICH CREATED AN UNACCEPTABLE RISK THAT THE JURY BELIEVED ITS FINDINGS ON MITIGATION HAD TO BE UNANIMOUS.

XXIV. BELL'S SENTENCE MUST BE REVERSED BECAUSE THE JURY WAS INSTRUCTED THAT IT COULD CONSIDER NON-STATUTORY AGGRAVATING CIRCUMSTANCES.

XXV. THE TRIAL COURT'S ANTI-SYMPATHY INSTRUCTION COUPLED WITH THE

DENIAL OF A MERCY INSTRUCTION VIOLATED BELL'S RIGHTS UNDER THE EIGHTH AND FOURTEEN AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE MISSISSIPPI CONSTITUTION.

XXVI. THE TRIAL COURT COMMITTED PLAIN ERROR IN NOT INSTRUCTING ON WHAT THE EFFECT OF BELL'S TENNESSEE SENTENCE WOULD BE IF THE JURY SENTENCED HIM TO LIFE.

XXVII. THE DEATH PENALTY IS DISPROPORTIONATE IN THIS CASE.

## ANALYSIS OF THE ISSUES

### THE GUILT PHASE ISSUES

### I. ADEQUACY OF THE VOIR DIRE

¶9. Bell urges that the voir dire of the jury at his trial was so flawed as to be meaningless and that as a result the jury was excessively weighted in favor of the prosecution by the presence of jurors with ties to the deceased and to law enforcement so as to deprive him of the protection guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. Specifically, he points out that eight of the twelve jurors either had relatives in law enforcement or had ties of family or friendship with the deceased or with his family. He argues that this was at least in part due to the trial judge's conduct in examining the panel with leading questions suggesting to the jurors the proper answers, his failure to conduct meaningful individual examination of the panel members, and his reliance upon the members' self-assessment of their ability to give Bell a fair trial.

¶10. We cannot today know how the trial judge would have conducted his voir dire if Bell had objected or raised these issues before him, because the defense gave him no opportunity to consider them. No objection was made as to the manner of the judge's questioning or to his decisions on challenges for cause. When the panel was tendered to the defense after the State's challenges for cause, six of the eight were acknowledged as acceptable. The last two were accepted after Bell had exhausted his challenges, but no request for additional challenges was made. Following trial, his post-trial motions raised no questions as to the voir dire procedures. We have held and hold today that a party who fails to object to the jury's composition before it is empaneled waives any right to complain thereafter. *Hunter v. State*, 684 So. 2d 625, 631 (Miss. 1996); *Myers v. State*, 565 So. 2d 554, 557 (Miss. 1990); *Pickett v. State*, 443 So. 2d 796, 799 (Miss. 1983). In the present case, any flaws in the judge's examination of the panel are mitigated by the leeway allowed defense counsel in his phase of the voir dire.

¶11. Having said this, we have also examined the record of the voir dire by the trial court as to possible plain error, and although we cannot say that the manner of examining the jury panel was desirable, its defects do not rise to the level of fundamental constitutional error. We do note, however, that trial judges should exercise caution in performing their profound duty to select fair, impartial and competent juries. Words coming from the judge bear special weight with those citizens who are asked to try the facts of cases, both civil and criminal. Care should be taken that the nuances imbedded in the judges' questions do not suggest that there is only one proper answer, and that questions are asked in a way that would not cause one, from fear or embarrassment, to give anything less than frank, honest answers. Questions such as "Do you know of any reason that you cannot be fair," are of little help, as they require an uncommon self

diagnosis. In *Fisher v. State*, 481 So. 2d 203, 222 (Miss. 1985), we censured "accepting at face value the assurances of the jurors impaneled that they could ignore what they had read and heard..." The voir dire in this case was extremely poor, however, counsel for the defendant acquiesced in the voir dire and further counsel for the defense was unfettered in his own voir dire.

¶12. Bell did, prior to voir dire, move for an individual, sequestered voir dire of the panel. He presented no argument or cause supporting this motion, and it was denied. As we said in *Hansen v. State*, 592 So. 2d 114, 126 (Miss. 1991), *cert. denied,* 504 U.S. 921(1992), and in *Ballenger v. State*, 667 So. 2d 1242, 1249 (Miss. 1995), *cert. denied,* 116 S. Ct. 2565, 135 L.Ed. 2d 1082 (1996)*,* this is a matter within the sound discretion of the trial judge. While not requiring the use of sequestered voir dire, Rule 5.02 of the Uniform Criminal Rules of Circuit Court Practice does, within the court's discretion, allow it, but only on good cause shown.

## II. THE DENIAL OF CHALLENGES FOR CAUSE

¶13. Bell next complains that five jurors, as to whom the judge denied challenges for cause, should have been excused because of their relationships to the victim, to other jurors, or to law enforcement. Because they were not, he was compelled to use five of his peremptory challenges to exclude them, thus, the argument goes, being deprived of a full twelve peremptory challenges to be used on the remaining panel. He is particularly aggrieved by the trial court's reliance on these jurors' self-assessments of their ability to be fair and unbiased. In summary, the judge's voir dire of these went as follows.

Juror Burns' husband was a retired Washington County police officer, and she had, in the past, worked with the victim's mother for about six months. She told the court she did not think this would affect her ability to be impartial. The judge asked her what she meant by "didn't think," and she responded that she was certain she could judge the case on the evidence presented.

Juror Cook stated that her father had been a deputy sheriff in Grenada three or four years prior to trial. In addition, her mother was also on the panel. The judge stated that he would not allow both of them to sit on the jury but would not dismiss her because her father had been a deputy several years ago.

Juror Haley had a business relationship with the father for about six months prior to voir dire. While doing business, the father told him he knew Haley had been selected to be on the panel and that was good, because "we need good jurors." The judge ruled that the remark was made in the course of business, and Haley gave strong, vigorous answers that their relationship was only one of business.

Juror Leverette's wife knew who the victim's mother was through work, and he also went to church with the victim. The juror told the judge this would not affect him. However, during Bell's voir dire of the jurors, Leverette stated that he did send a card to the victim's family. The judge denied the challenge for cause stating, "[t]he sending of a card is an expression of sympathy as a member of the church, . . . and I don't think it does indicate that he has any feelings about this case."

Juror Sheffield owned an auto-parts business where the victim's father had done some business over the past twenty-five years. They had occasionally attended the same dove shoots, though not traveling to them together. He stated that he was not uncertain about his ability to be fair and impartial. The judge denied the challenge for cause, because the business was one where the victim's father only

occasionally came in to purchase parts, and the two had never done anything together socially, except, perhaps, be at dove shoots to which they were both invited.

¶14. The circuit judge has wide discretion in determining whether to excuse prospective jurors, including those challenged for cause. *Scott v. Ball*, 595 So. 2d 848, 849 (Miss. 1992); *Burt v. State*, 493 So. 2d 1325, 1327 (Miss. 1986). The judge will be reversed only upon a finding of an abuse of that discretion. *Berry v. State*, 575 So. 2d 1, 9 (Miss. 1990). Bell would have the two jurors who were related to former law enforcement officers disqualified for that fact alone. However, as enunciated in *Mhoon v. State*, 464 So. 2d 77, 81 (Miss. 1985), "there is no reason why an officer or an officer's relative should not serve on a jury if otherwise qualified to follow the law and the evidence." *See also Cook v. State*, 242 Miss. 29, 134 So. 2d 151 (1961). In *Mhoon*, the Court reversed the conviction based not on the fact that someone with law enforcement ties sat on the jury, but rather on the disproportionate part that such connections played in the jury composition. Five of the jurors there had such connections, and the jury foreman was a uniformed officer while sitting, a circumstance which the Court described as "unique" and "novel." *Id.* at 82. *Mhoon* endorsed the practice of allowing additional peremptory challenges to the defense. In the present case, Bell did not request additional challenges.

¶15. As to Jurors Burns, Haley, Leverette and Sheffield, they each disclosed acquaintances and business relationships with relatives of the deceased. However, each of them declared, under oath, that their relationships would not prevent them from following the court's instructions and applying it fairly to the facts of the case. While the judge's voir dire may not have probed as deeply as Bell thinks the questions should have into these jurors' ability to try the case fairly, Bell, of course, had the opportunity to pursue any questions through his attorney's examination of the jurors. He did not choose to do so.

¶16. Mere acquaintance or even family relationships with parties or those related to parties is not sufficient to require that a juror be excused for cause. In *American Creosote Works of La. v. Harp*, 215 Miss. 5, 60 So. 2d 514 (1952), we declined to reverse the trial judge who failed to exclude a juror who indicated that he lived in the same community with a party and was a member of the same church and lodge, but who stated under oath that these facts would not influence his verdict. In *Rush v. State*, 278 So. 2d 456 (Miss. 1973), although a prospective juror knew the defendant and had obtained a judgment against him, where he stated that he could put the relationship out of his mind and try the case on the facts and the law, we found no error in failing to excuse him for cause.

¶17. We find no abuse of discretion in this regard.

### III. THE EXCLUSION OF JURORS WITH SMALL CHILDREN

¶18. Bell asserts that the trial court committed error in excusing two jurors, Ringo and Saulters, for cause, because they were in charge of small children. Bell argues that this violated his right to a fair trial and violated the Fourteenth Amendment's Equal Protection clause by excluding women from jury service merely because of their gender. *See J.E.B. v. Alabama*, 511 U.S. 127 (1994) (wherein the United States Supreme Court extended *Batson*, holding that discrimination on the basis of gender violates the Equal Protection Clause). As further support for this position, he cites *Duren v. Missouri*, 439 U.S. 357 (1979), in which the Supreme Court declared unconstitutional on Sixth Amendment "fair cross-section" grounds, a Missouri statute granting women who so requested an automatic exemption from jury service. He argues the exclusion of Ringo and Saulters was automatic without any regard to whether the women's domestic responsibilities would preclude them from being fair jurors.

¶19. The record does not support Bell's complaints as to these jurors. First, it is noted that at the time that they were excused, no objection was made. Further, they were examined and excused in a context of the court's effort to determine which jurors had outside demands sufficient to constitute a serious distraction from their duties and which would make sequestration or long hours an undue burden. Juror Ringo was a grandmother who regularly kept her daughter's small children. The daughter would be required to miss work if she was not available. Juror Saulters, along with some other jurors, were excused not merely because they had children, but because their inability to make arrangements for the care of those children was such as to hamper their ability to give the case sufficient attention. She stated that she had two small children and if she was not home her husband would have to miss work to care for them. This was complicated by the fact that her husband had out-of-town business appointments the following two days. This is clearly neither a gender-based exclusion nor the deprivation of a fair cross-section of the community under *Duren*; it simply was not an unreasoned, automatic exclusion of women with families. There was no error in the exclusion of these jurors.

## IV. INSTRUCTIONS S-2 AND S-3

¶20. The jury received the following instructions, which Bell would have us find allowed the jury to convict him as a principal in disregard of his defense that, at most, he was an accessory after the fact. Instruction S-2 reads:

> The Court instructs the jury that each person present at the time, and consenting to and encouraging the commission of a crime, and knowingly, willfully and feloniously doing any act which is an element of the crime or immediately connected with it, or leading to its commission, is as much a principal as if he had with his own hand committed the whole offense; and if you believe from the evidence, beyond a reasonable doubt, that the defendant, Frederick Bell did willfully, knowingly, unlawfully and feloniously do any act which is an element of the crime of capital murder or *immediately connected with it*, or leading to its commission, then and in that event, you should find the defendant guilty as charged. [emphasis added].

This is followed by S-3:

> The court instructs the jury that if two or more persons are engaged in the commission of a felony, then the acts of each in the commission of such felony are binding upon all and all are equally responsible for the acts of each in the commission of such felony.

¶21. Bell does not argue that instruction S-3 is an incorrect statement of the law, nor did he object to it at trial. He reasons that the use of the phrase "immediately connected with" [the crime], in the second clause of S-2, allows the jury, upon finding that he hid the guns used to shoot Bert, to convict him as a principal in a capital murder, and that this problem is compounded when S-2 is read with S-3. This, he argues, deprives him of his alternate theory of how Bert lost his life and the benefit of his testimony, contrary to the testimony of Coffey and James, that Doss brought the guns to Memphis and that he [Bell] had not been in Grenada on the day of the shooting, or for several days prior to the shooting, but simply cooperated in hiding the guns.

¶22. Bell failed to make a timely objection to S-2, and under our holdings in *Nicholson on behalf of Gollott v. State*, 672 So. 2d 744, 752 (Miss. 1996), and *Lockett v. State*, 517 So. 2d 1317, 1332-33,

(Miss. 1987); *cert. denied*, 487 U.S. 1210 (1988), we are not bound to consider this assignment. Alternatively, we note that all instructions charging the jury must be read together, and S-2 cannot be read without regard to others, specifically S-1, which requires the jury, in order to convict Bell of capital murder, to find that Bell did unlawfully, willfully and feloniously kill Bert, while engaged in the crime of armed robbery. The instruction then directs that "if the State has failed to prove any one or more of the above elements beyond a reasonable doubt, then you shall find the defendant not guilty."

¶23. An aiding and abetting instruction, in the form complained of here, was most recently approved in *Carr v. State*, 655 So. 2d 824, 833 (Miss. 1995), *cert. denied* 116 S. Ct. 782, 133 L.Ed. 2d 733 (1996). In *Carr* we pointed out that the instruction sufficiently instructed the jury of the element of intent and that "when read in the context of the jury charge as a whole, [this instruction] correctly placed the burden on the State to prove beyond a reasonable doubt every element of the underlying felonies with which Carr was charged." *Id.* at 833. The instruction was also approved in *Simmons v. State*, 568 So. 2d 1192, 1203-1204 (Miss. 1990).

## V. FURTHER OF INSTRUCTION S-2

¶24. Bell also complains that instruction S-2 is defective in that it invites the jury to assume rather than to find that a capital murder had been committed. It simply does not do so. Bell asks us to apply the decision reached in *Wilson v. State*, 592 So. 2d 993 (Miss. 1991), which holds that it was improper for the jury to be instructed that an accessory before the fact should be found guilty if he had "willfully, unlawfully and feloniously and knowingly arrange[d] for or counsel[ed] or command[ed] another to sell cocaine . . ." *Id.* at 997. But *Wilson* is not applicable. There the Court noted that neither in the instruction complained of nor "in any of the instructions submitted to the jury" was the jury informed that they had to find that the crime was committed as well as finding that Wilson counseled or commanded the commission of the crime. *Id.* at 997-98. Here, Bell is prosecuted as a principal present at the crime, and instruction S-1, after defining the elements, explicitly enjoins that he be found not guilty if the State has failed to prove any one or the elements beyond a reasonable doubt.

## VI. BELL'S INFORMANT/ACCOMPLICE INSTRUCTION DG-14

¶25. This instruction reads:

> The Court instructs the jury that the law looks with suspicion and distrust on the testimony of an alleged informant, and requires the jury to weigh same with great care and caution and suspicion. You should weigh the testimony from alleged informant, Robert James, and passing on what weight, if any, you should give this testimony, you should weigh it with great care and caution, and look upon it with distrust and suspicion.

¶26. Bell asserts that the refusal of this instruction is error because James was present at the scene and possibly participated; he was an informer who had incentive to lie or the police might charge him with capital murder; and his trial testimony differed from a previous statement and from that of Frank Coffey, who was charged as an accomplice.

¶27. He relies on *Ferrill v. State*, 643 So. 2d 501 (Miss. 1994), and *McGee v. State*, 608 So. 2d 1129 (Miss. 1992), in which we found reversible error where the trial court refused an instruction on effect of impeachment of witness by his own prior inconsistent statement. But here, no significant prior inconsistent

statement by James is called to our attention, nor do we find one. It is true that Frank Coffey had given a statement inconsistent with that of James, but this instruction does not address such an event. Bell suggests that James's pre-trial statement that one of the guns used had black tape on its grip and his courtroom testimony describing the tape as gray is an inconsistency sufficient to justify a cautionary instruction. We do not consider such natural variations in repeated descriptions to be inconsistencies sufficient to justify a cautionary instruction beyond those general instructions given.

¶28. *Ferrill* was also reversed on the failure of the trial judge to grant an accomplice cautionary instruction. However, James, in the case *sub judice*, was not charged as an accomplice, nor was there any evidence offered that he should have been so charged.

## VII. INSTRUCTIONS DG-12, DG-15 AND DG-16, MORE OF IMPEACHMENT AND INCONSISTENT STATEMENTS

¶29. In addition, Bell asked for two instructions, DG-12 and DG-15, advising the jury that they were the sole judges of the credibility of witnesses and advising them that inconsistencies within statements of a witness or between those of different witnesses may cause the jury to discredit a witness's testimony. He also sought and was denied DG-16 which addresses impeachment in an abstract way and instructs the jury that it may disregard impeached testimony. Much of his argument in this area is concerned with the ability to warn the jury of the dangers in relying on the testimony of Frank Coffey. Furthermore, the jury was advised by way of the court's charge, that they were the sole judges of the credibility of the testimony and supporting evidence, by instruction DG-11 that reasonable doubt of guilt may be based on conflicts in the evidence or the credibility of witnesses, and by DG-13 that the testimony of Frank Coffey as that of an accomplice should be viewed with suspicion. The trial judge is under no obligation to grant redundant instructions. *Davis v. State*, 568 So. 2d 277, 280-81 (Miss. 1990). Indeed, to do so can only create confusion and make it more difficult for the jury to understand the charge. When the instructions are read as a whole, as indeed they must be, we find no error in the refusal of these specific requested instructions.

## VIII. EXCLUSION OF COFFEY'S CONVICTION

¶30. The testimony of Frank Coffey was crucial to the prosecution. He placed Bell at the scene, reported statements of Bell that they intended to rob the store, and, most importantly, said that Bell told him that he shot Bert. In order to impeach Coffey's testimony, Bell offered evidence that Coffey was not only indicted as an accessory after the fact of Bert's death, but that he had been indicted in Memphis of solicitation to commit murder of another party. In fact, Bell and Coffey had both pled guilty to the Memphis crime, and, prior to the Grenada County trial, Coffey had been sentenced to three years in prison, and Bell to twenty-five. The trial judge declined to allow evidence as to either Coffey's or Bell's complicity or conviction in that murder. In excluding the evidence of Coffey's conviction, the judge exercised his discretion under Miss. R. Evid. 609(a), which allows discretionary admission of prior convictions for the purpose of impeaching the credibility of witnesses. Prior to admitting such evidence, the judge must determine that the probative value of the evidence outweighs its prejudicial effect. While it cannot be said that in this case the circuit judge articulated the factors outlined in *Peterson v. State*, 518 So. 2d 632 (Miss. 1987), it is clear on the record that the probative value and the prejudicial effect of the evidence was considered. In the colloquy, the judge noted the fact that Coffey was also indicted as an accessory in the present crime, and that such fact would be available in an attack on his credibility. Furthermore, the judge made specific references to *Peterson* and to the necessity of finding, before allowing the conviction before the jury, that the probative value

outweighed any prejudice. We further note that the party seeking to have the conviction admitted for impeachment has the burden of persuasion.

¶31. Here the judge faced a particularly difficult choice, for if he allowed evidence of Coffey's Memphis conviction while excluding that of Bell, the jury would have seen that conviction in an unreal light. Finally, as observed above, the jury was instructed that Coffey's testimony in particular was to be viewed with suspicion. Had he decided to allow both convictions, there is no doubt that Bell would have been seriously prejudiced. Considering all these circumstances, we find that no error was committed by the exclusion of the fact that Coffey had been convicted of the Memphis crime.

## IX. COFFEY BOLSTERED ON REBUTTAL

¶32. Bell next argues that the trial court erroneously overruled Bell's objection to the prosecutor's question about "the only thing" that the prosecutor asked Coffey to do in court and Coffey's response that the prosecutor told him to "tell the truth." Bell claims that this was hearsay and it had the effect of improperly bolstering Coffey's testimony by throwing the integrity of the State behind it. The prosecution asked this question on redirect examination of Coffey, and the record indicates that it was asked in direct reaction to interrogation by defense counsel on cross-examination, suggesting that there was some type of deal between the witness and the district attorney's office. Under the circumstances, this was proper redirect on a matter brought out by defense counsel on cross. *Jackson v. State*, 551 So. 2d 132, 144-45 (Miss. 1989) (in view of the nature of cross-examination, the circuit court was within its discretionary authority in allowing the disputed redirect).

## X. EVIDENCE OF OTHER CRIMES COMMITTED BY BELL

¶33. Robert James testified to his encounter with Doss and Bell immediately following the incident. At the time of the robbery of Sparks' Stop-and-Go and the killing of Bert Bell, James and Coffey were within earshot. Doss and Bell caught up with them only two or three minutes after the shots were fired. Over Bell's objection, James testified that Bell then pointed the gun, which was stolen from the store, at James and made the statement that they [Doss and Bell] did not need any witnesses. Then, in the same conversation, Doss and Coffey convinced Bell that James would not talk about the incident and that it was not necessary to kill him.[2] James said further that as they walked on down the road, Bell described the shooting, demonstrating in detail the entry points of the bullets which he shot at Bert. This testimony was significant in that it constituted independent confirmation of the physical and forensic evidence. James explained that his reason for not going to Memphis with the others was the threat on his life made by Bell.

¶34. Coffey then testified confirming Bell's statements on the same occasion claiming credit for the shooting and adding detail as to Bell's claimed positions in the store and attempt to open the cash register. He likewise, over Bell's objection, confirmed Bell's statement made to James that he did not want any witnesses as well as his assurance to Bell that James would not talk. He then told of how they were driven to Memphis and of a conversation in which Bell said that he wanted to go back and shoot James. Again, Coffey, this time joined by Bernard Gladney, the driver, reassured Bell. Finally, he testified that Bell, on a later occasion, had threatened to kill him, Coffey, if he testified. No objection was made to the latter statement.

¶35. On appeal, Bell argues that the statements regarding the threats on James' life were highly prejudicial, and that their admission into evidence was error. Whether or not prejudicial, they were certainly and

seriously damaging to his defense, as they were no doubt meant to be. His argument is based largely on the injunction of Miss. R. Evid. 404 against the use of character evidence and evidence of other crimes or wrongs, except under specific circumstances set out in the rule. Rule 404(a) has no application here since this evidence was admitted not as character evidence indicative of a propensity to commit murder, but directly as evidence of the crime charged. His threats upon the life of James, or more accurately, his musings and debates over whether or not to kill James, were made in the midst of describing the killing of Bert and while displaying the weapon used. They show a great deal of concern immediately following the crime of his vulnerability to punishment for the crime charged in this case. On study of the record, we cannot see how these important details could have been related in a sanitized version of James' and Coffey's testimony, nor do we see any obligation on the State to do so.

¶36. Bell argues correctly that evidence of *unrelated* crimes or bad acts is not admissible to show that his actions in the commission of the crime charged are in conformity with his actions in the unrelated crimes. ***Ballenger***, 667 So. 2d at 1256-57; ***Duplantis v. State***, 644 So. 2d 1235, 1247-48 (Miss. 1994), *cert. denied* 514 U.S. 1123 (1995); ***Lesley v. State,*** 606 So. 2d 1084, 1089-90 (Miss. 1992). But bad acts or crimes which are intimately connected with the crime charged as to be necessary to the telling of a complete and clear story are admissible. ***Ballenger****, loc. cit.*; ***Brown v. State***, 483 So. 2d 328, 330 (Miss. 1986). Furthermore, ***Ballenger*** and ***Duplantis*** stand for the oft-repeated rule that even where the evidence of such acts is otherwise admissible, the probative value of the evidence must be weighed against its possible prejudicial effect. But where the bad conduct is so closely intertwined with the crime charged and has a direct relationship to the escape, as it does here, there is no error in allowing the jury to hear it.

¶37. Finally, on this point, Bell argues that if the threats to James and Coffey were not admitted as propensity evidence, they were used and argued as such by the State in closing argument. In fact, they were not. They were used specifically for the purpose of showing that Bell feared punishment. At one point, the prosecutor did say that, "[t]here wouldn't have been near as much evidence if this person over here [Bell] thought these people were going to testify, because he's definitely capable of killing them." This is a legitimate use of the evidence to show his fear of retribution. If anything, the prosecutor is using the killing of Bert to show that the threat upon James and Coffey was real -- not that the threats were evidence of a propensity to kill Bert. There is no error in this argument.

## XI. FURTHER OF THE STATE'S ARGUMENT -- GUILT PHASE

¶38. Bell maintains that the prosecutor misused closing argument by improperly arguing the good character of the victim, threats made by Bell to James, lack of remorse, personal opinion and facts not in evidence. Unless any such improper argument is so egregious as to rise to the level of a fundamental denial of a constitutionally-mandated fair trial, and we do not so find, the arguments are all procedurally barred, for at no time did Bell make a contemporaneous objection to any of them. ***Chase v. State***, 645 So. 2d 829, 854 (Miss. 1994), *cert. denied* 515 U.S. 1123 (1995). Nevertheless, we will review the specific claims.

### A. Good character of the victim

¶39. The prosecutor said that Sparks'Stop-and-Go was:

> a place he [Bert] intended, according to James Sparks, to buy from James Sparks' and take that store over one day. That would be his store. Apparently, an industrious young man, 21 years of age, thinking that maybe he was going to be able to own his own store. I commend him for that.

Also, he said:

> Bert Bell's life is now reduced to approximately 50 exhibits. That's what his life is all about today. . . . And, Bert Bell didn't have a prayer. He did not have a prayer. He was going to die that day. There's no doubt about it. He didn't have a chance.

¶40. An impassioned argument is not in itself an improper argument. Furthermore, the prosecutor, as any other counsel, is free to recall and comment on testimony offered in evidence and to draw inferences.

> [The prosecutor] may comment upon any facts introduced into evidence. He may draw whatever deductions seem to him proper from these facts, so long as he does not use violent and abusive language, and even in many cases invectives may be justified and even called for, as pointed out by Chief Justice Whitfield in *Gray v. State,* 90 Miss. 235, 43 So. 289 [1907].

*Davis v. State*, 684 So. 2d 643, 656 (Miss. 1996)( *quoting **Shell v. State***, 554 So. 2d 887, 900 (Miss. 1989), *rev. on other grounds* 498 U.S. 1 (1990), and ***Nelms & Blum Co. v. Fink***, 159 Miss. 372, 131 So. 817 (1930)). This liberty is, of course, not without limitation. An appeal to emotion or for sympathy for a victim can reach a point at which it is prejudicial. In ***Willie v. State***, 585 So. 2d 660, 679 (Miss. 1991), we disapproved blatant comparisons of the value of the victim's life and that of the defendant. However, such was not done here, and we do not find that the prosecutor's comments transgressed the limits of fair argument.

### B. The threats to kill Robert James

¶41. The prosecutor also commented on the evidence of Bell's threats upon the life of Robert James. That evidence, as observed above, was appropriate in the present factual context, and it is sufficient here to say that the comments and conclusion of the prosecutor were not inappropriate. They described Bell's behavior immediately following the crime and his fear of being caught and prosecuted.

### C. Lack of remorse.

¶42. Referring to the testimony of Buster Graham, an officer who interviewed Bell following his arrest, the prosecutor said:

> [a]nd to me, the most illogical thing about this whole case, and I think it shows his attitude, I don't know any human being that's going to be placed in jail and told they're charged with capital murder that's going to sit up and laugh at the officer.[3] Laugh at him. We're talking about two mean people. Doss isn't even as bad as Bell.

Additionally, he said that "this person laughs when you talk to him about being charged with murder," and alluded to "the same day that he laughed at Bruce Partridge and Buster Graham."

¶43. Bell argues that this is impermissible commentary on his lack of remorse and presents authority which he says prohibits such references to remorse when the defendant does not testify, as in the present case. However, those authorities are misapplied by Bell. In ***Reed v. State***, 197 So. 2d 811 (Miss. 1967), the district attorney asked the jury to look at the defendant as he sat mute in the courtroom exhibiting no emotion whatever. We held that such argument was an impermissible comment on his failure to testify. In ***Knox v. State***, 502 So. 2d 672 (Miss. 1987), we again found that comment on the courtroom demeanor

of the defendant who chose not to testify was improper. Bell, on the other hand, did testify and testified that he laughed at the suggestion in his interview with officer Graham that he killed Bert. It was perfectly proper for the prosecutor to comment on this interview and Bell's testimony.

### D. The prosecutor's personal opinion and facts not in evidence

¶44. Arguing that the prosecuting attorney unfairly presented his personal opinion and argued facts not in evidence, Bell points to the following from the State's summation.

> I don't doubt that Frederick Bell knew the name of that road. I don't doubt that at all. I don't doubt that he didn't know that was Sparks' Stop-and-Go. I do doubt that he knew he was in Grenada County, because that wasn't important to him. He and Anthony Doss could just as easily have stopped in Yalobousha County, gone over to Carroll County. It didn't make any difference. Their objective was not where they were, but what they had to do. Anything they could do to get enough money to get them to Memphis, for whatever reason, that's what -- that's the only thing they cared about.

He also points again to statements made in that argument that Doss and Bell were "mean people," and observations that Coffey was not seeking anything from the State, but rather was testifying to the truth. Whether Doss and Bell were mean people is something to be concluded from the facts proved, and is, within the limits of the argument here, a fair deduction to be drawn in final argument. Of course, Coffey was cross-examined by Bell's attorney on his veracity and any deal he had made. In response, he testified that he was telling the truth. The statements by the prosecutor were based on that testimony and were far from the personal vouching for witnesses which we have condemned.

¶45. Bell also complains of the argument by the State that certain details of James' testimony indicate that Bell and Doss told him of the shooting because the investigators had not shown James any pictures of the scene. A review of the record does not indicate any testimonial basis for this argument, and it was, therefore, improper. However, it does not, standing alone or read with the rest of the argument, constitute reversible error.

### XII. THE COURT'S FAILURE TO PROVIDE BELL WITH

### A BALLISTICS EXPERT

¶46. Although Bell depended on an alibi theory, on appeal he asserts that the trial court erred by failing to provide him with a ballistics expert who could have, he urges, helped establish that Doss, not Bell, fired the fatal shots, and could have assisted in cross-examination of the State's expert. We need not today consider the circumstances under which it may be appropriate for the trial judge to provide expert assistance to the defense, however, because the record does not reflect that Bell ever asked for such assistance. In his brief, Bell says that the court denied his motion. This is incorrect. Doss did move for such assistance, and the motion was denied. However, the record does not include a similar motion by Bell or a joinder by Bell in Doss's request. There is no merit to this assignment of error.

### XIII. DR. HAYNE'S TESTIMONY

¶47. Bell argues that it was error for the trial court to allow, over Bell's objection, the testimony of Dr. Hayne that at the time of one of the gunshot wounds, the victim was holding his hands in front of his face. In

support of his position, he cites the following from *Austin v. State,* 324 So. 2d 245 (Miss. 1975):

> According to the overwhelming weight of authority, the opinions of medical experts are not admissible to show the [position] of an injured person at the time the wound was received, or the position of the person who inflicted it, because, as has been said, surgeons are not presumed to be experts in the matter of giving or receiving wounds, and the jury are equally capable of drawing proper inferences from the facts proved. [citation omitted].

*Id*. at 248 (*quoting **Rigell v. State***, 8 Ala. App. 46, 55, 62 So. 977, 980 (1913)). ***Accord Dillard v. State***, 58 Miss. 368 (1880) (testimony of physician, as expert, as to relative positions of prisoner and deceased during affray, as shown by blood marks, is inadmissible as relating to a matter of common sense and experience, of which jury are exclusive judges).

¶48. In *Austin* the Court ruled it error to allow a pathologist to testify to the position of a shooting victim's arm at the time the fatal shot was fired when the question was whether the victim had been an aggressor. *Austin*, 324 So. 2d at 249. However, in ***May v. State***, 524 So. 2d 957, 962 (Miss. 1988), the Court stated that the obvious rationale of *Austin*, in the murder/self-defense context, "is that such testimony would amount to an opinion on the ultimate fact, effectively invading the province of the jury." Moreover, *Austin* was decided prior to the promulgation of the Mississippi Rules of Evidence.

¶49. This argument is clearly procedurally barred. The State asserts that there is no objection to this testimony in the record. Although Bell argues that he objected throughout the trial to this type of evidence, there is no contemporaneous objection to any of Dr. Hayne's testimony concerning the gunshot wounds to the hands.

¶50. In addition, Dr. Hayne was qualified as an expert in forensic pathology, which includes expertise in how wounds are received. This expertise necessarily relates to the position of the body at the time. The State contends that this is allowable under Miss. R. Evid. 702, Testimony by Experts.

¶51. Although there have been cases cited where experts were not permitted to testify to the position of the body, these are not consistent with the rules of evidence and the substance of the complained of testimony. Miss. R. Evid. 702 states: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Bell stipulated as to the fact that Dr. Hayne was an expert in forensic pathology. Forensic pathology is generally accepted as a division within pathology requiring a medical degree and advanced training in forensic pathology. A forensic pathologist addresses two basic questions: what was the cause of death, and what was the manner of death? Rule 702 allows Dr. Hayne to opine as to the path of the lethal gunshot wound and that path is through the third finger on the right hand into the left temple. This view has broad acceptance in jurisdictions applying Rule 702. *See **Eason v. United States***, 687 A. 2d 922 (D.C. 1996) ;***State v. Thomasson***, 832 P. 2d 743 (Idaho 1992); ***State v. Sparks***, 255 S.E. 2d 373 (N.C. 1979). This assignment of error has no merit.

### XIV. DENIAL OF INSTRUCTION ON THE LESSER INCLUDED OFFENSE

¶52. Bell argues that the trial court erroneously refused Bell's request for a simple murder instruction. The trial judge stated, "I don't think there's anything that would allow us to give a lesser-included instruction."

Bell maintains that under the Eighth and Fourteenth Amendments to the United States Constitution, a capital murder defendant is entitled to an instruction on any non-capital offense supported by the evidence. Further, he cites *Fairchild v. State*, 459 So. 2d 793 (Miss. 1984), wherein this Court said:

> [o]nly if this Court can say, taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence, and considering that the jury may not be required to believe any evidence offered by the State, that no hypothetical, reasonable jury could convict [the defendant] of simple murder, can it be said that the refusal of the lesser-included instruction was proper [citation omitted].

*Id*. at 801. However, the Court also ruled that "a lesser-included offense instruction should never be granted on the basis of pure speculation." *Id.* (affirming the denial of a lesser-included offense instruction for manslaughter).

¶53. In *Fairchild*, the State presented evidence to show that Fairchild agreed with his co-defendant, Dickson, to rob the victim and gave Dickson a knife. Later, while Fairchild was asleep, Dickson murdered the victim. After Dickson awoke Fairchild, the two defendants stole the victim's jewelry and travelers checks, which they split. The Court held it was error to have refused Fairchild's requested simple murder instruction because to hold otherwise would be to find that the defendant is already guilty of the underlying felony.

¶54. The State argues correctly the procedural bar of *Nicholson* and *Lockett, supra,* as Bell interposed no objection to the refusal of this instruction.

¶55. Alternatively, the State points out that a similar issue was decided by the Court in *Abram v. State*, 606 So. 2d 1015 (Miss. 1992). In *Abram*, the Court upheld the trial court's refusal of a simple murder instruction where the defendant was charged with capital murder. The Court stated, "the evidence must support a finding that the killing was not committed during the commission of armed robbery in order to justify a simple murder instruction." *Id*. at 1035. There is simply no evidence in this case to suggest Bert's murder was not committed during an armed robbery, especially in light of the discovery of the .38 caliber pistol belonging to the store under the control of Bell in Memphis. This issue is procedurally and substantially without merit.

## XV. CONSTRUCTIVE AMENDMENT OF THE INDICTMENT

¶56. Miss. Code Ann. § 97-3-19(2)(e) (1994) states that capital murder is the "killing of a human being without the authority of law by any means or in any manner . . . [w]hen done *with or without any design to effect death,* by any person engaged in the commission of the crime of . . . robbery..." [emphasis added] . The State, Bell argues, could therefore have indicted Bell for a killing done with malice aforethought or for one done without a design to cause death. In fact, the indictment charged that Doss and Bell "unlawfully, wilfully, feloniously and of their *malice aforethought*" killed and murdered Bert [emphasis added].

¶57. At trial, and without objection, the court instructed the jury that Bell should be found guilty of capital murder if he "did unlawfully, willfully, and feloniously kill Robert C. 'Bert' Bell . . . " while engaged in a robbery. By omitting the element of malice or design, this instruction, Bell contends, constructively amended the indictment by allowing conviction of murder committed without deliberate design, thus broadening the basis for conviction. Having made no objection on this ground, Bell urges, as he must, that allowing the

instruction so seriously flawed his trial as to constitute plain error, cognizable to this Court even though not preserved as required by ***Nicholson, Lockett***, *supra,* and ***Conner v. State***, 632 So. 2d 1239, 1255 (Miss. 1993), *cert. denied* 513 U.S. 927 (1994). ***See also Ross v. State***, 603 So. 2d 857, 860-61 (Miss. 1992).

¶58. A constructive amendment of the indictment occurs when the pr oof and instructions broaden the grounds upon which the defendant may be found guilty of the offense charged so that the defendant may be convicted without proof of the elements alleged by the grand jury in its indictment. ***See United States v. Miller***, 471 U.S. 130 (1985). Bell argues that, in addition to violating the Fifth Amendment right to grand jury indictment, constructive amendments deny a defendant sufficient notice to prepare and present an adequate defense in violation of the Sixth Amendment right to notice and the Fifth Amendment right to due process. ***Cole v. Arkansas***, 333 U.S. 196, 201 (1948); ***Hunter v. State of New Mexico***, 916 F.2d 595, 599 (10th Cir. 1990).

¶59. We decided a very similar issue against the defendant in ***Berry v. State***, 575 So. 2d 1 (Miss. 1990). Berry argued that the indictment charged him with intentional murder and that the jury instructions failed to include a charge requiring the jury to find that the murder was intentional. *Id*. at 13. He maintained that the State must be held to the higher standard of proof and that the State failed to prove the crime for which he was indicted. We held that the indictment provided sufficient notice to give Berry fair knowledge of the crime charged. *Id*. Here Bell asserts that the rationale of ***Berry*** is unsound and that the State should be required to prove intent as alleged.

¶60. The concept of constructive amendment of an indictment is founded largely on ***Stirone v. United States***, 361 U.S. 212 (1960), in which the defendant was charged with interference with interstate commerce under the Hobbs Act by extortion. The indictment charged as the interstate commerce nexus, the importation of sand into Pennsylvania to be used in the construction of a steel mill. After the trial began, the government was allowed to produce evidence and to argue that the extortion also impacted the exportation of steel from Pennsylvania, and the jury was charged that Stirone's guilt could rest either on a finding that the sand was imported from another state or that the concrete into which it went was used to build a steel mill which would ship steel out of the state. Both the evidence and the charge to the jury as to the impact on the exportation of steel were subject to objections by the defendant. The Court held that the district judge committed error in allowing this broadening of the basis on which Stirone could be convicted. "Although the trial court did not permit a formal amendment of the indictment, the effect of what it did was the same. And the addition charging interference with steel exports here is neither trivial, useless, nor innocuous." ***Stirone*** 361 U.S. at 217.

¶61. Not all variances between the indictment and instructions constitute a constructive amendment, nor do they rise to plain error. The central question is whether the variance is such as to substantially alter the elements of proof necessary for a conviction. The distinction was explained well in ***United States v. Adams***, 778 F. 2d 1117 (5th Cir. 1985). There, analyzing the holding of ***Stirone,*** the Court of Appeals said:

> ***Stirone*** requires that courts distinguish between constructive amendments of the indictment, which are reversible *per se*, and variances between indictment and proof, which are evaluated under the harmless error doctrine. The accepted test is that a constructive amendment of the indictment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an

essential element of the offense charged. . . . In such cases, reversal is automatic, because the defendant may have been convicted on a ground not charged in the indictment. . . . If, on the other hand, the variation between proof and indictment does not effectively modify an essential element of the offense charged, "the trial court's refusal to restrict the jury charge to the words of the indictment is merely another of the flaws in trial that mar its perfection but do not prejudice the defendant." [citations omitted.]

*Adams* 778 F.2d at 1123. The Court of Appeals reversed where the indictment charged the defendant with falsifying an application for a firearm by giving a false name, but the proof and the instructions added the falsification of the defendant's address. That was found to be an additional factual element upon which the conviction could be based, and it thus constituted an amendment to the indictment. It is also worth noting that the defendant strenuously and contentiously objected to that action.

¶62. The issue here is virtually identical to that in *Berry*. Bell's indictment appears to be sufficient. Notwithstanding the "malice aforethought" language, the indictment clearly serves notice that Bell is being charged with murder while engaged in the commission of the crime of armed robbery in violation of Miss. Code Ann. § 97-3-12(2)(e) (1994).

## XVI. THE PHOTOGRAPHS

¶63. The State introduced ten photographs of Bert's body. These showed the position of the body and the location and nature of the wounds. Bell argues that the photographs were not necessary to any contested issue, that their prejudicial nature outweighed any possible probative value, and that they were repetitious and cumulative. We will not reverse a trial court on the admission of such evidence in the absence of an abuse of discretion. *Jenkins v. State,* 607 So. 2d 1171, 1175 (Miss. 1992). Here, considering questions raised as to who had which gun, what were the fatal shots, and who fired those shots, we cannot say that the circuit judge committed such an abuse.

## THE SENTENCING PHASE ISSUE

## XVII. SENTENCING INSTRUCTION S-1

¶64. At trial, Bell objected to sentencing instruction S-1, which listed those aggravating circumstances the jury could consider, on the grounds that the Tennessee incident occurred subsequent, not prior, to the murder of Bert, arguing that such an offense, in order to be an aggravating circumstance, must occur prior not only to the trial but also to the commission of the charged crime. He now abandons that objection and argues eight different flaws in this instruction, none of which were asserted at trial. For that reason, all of those claims of defect are waived and procedurally barred. *Carr*, 655 So. 2d at 856 (applying the procedural bar to claims of error in sentencing instructions on aggravating circumstances); *Conner*, 632 So. 2d at 1255 (holding that an objection on one or more grounds waives objections on other grounds not presented to the trial court). Nevertheless, as to these newly-raised objections we observe the following.

> **A. No evidence to support an aggravator that the offense was committed after Bell had previously been convicted of another capital offense.**

¶65. One of the elements of aggravation presented to the jury was "whether defendant, Frederick Bell, was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person." Bell argues that the State presented evidence showing that Bell had, in Tennessee, been indicted

for first degree murder but convicted of second degree murder. The certificate which accompanied the indictment (which was not admitted into evidence) made reference to the charge in the indictment of murder in the first degree. Second degree murder is not a capital offense in Tennessee. Therefore, the reference in the instruction to "another capital offense" as an aggravator is, Bell argues, fatal to the instruction as a whole. He asserts that both state and federal law prevent this Court from performing reweighing or harmless error analysis where an aggravating circumstance is invalid. *Wilcher v. State*, 635 So. 2d 789, 790-91 (Miss. 1993). It is certainly true that we did in *Wilcher* hold that we will not and cannot apply harmless error analysis to aggravating factors.

¶66. The instruction, using the phrasing of the statute, Miss. Code Ann. § 99-19-101(5)(b), stated the alternatives under this aggravator disjunctively: "convicted of another capital offense *or* of a felony involving the use or threat of violence." (Emphasis added). This disjunctive language does not render the aggravator invalid. While it would have been better form, and one that we commend to trial courts, to choose one or the other (conviction of a capital offense or of a felony involving violence) for its aggravator, there was sufficient evidence that Bell had been convicted of a felony involving the use or threat of violence to the person. Capital murder was never argued by the State or brought up in any way and only found on a rather insignificant piece of evidence. Thus, Bell's argument that "some of the jury may have been thinking capital murder was the aggravator" fails. It simply is not strong enough in the face of the State's submission of the judgment of conviction for second degree murder and closing argument.

¶67. The argument is not unlike that of the defendant in *Shell v. State*, 554 So. 2d 887 (Miss. 1989), claiming that the disjunctive presentation of the "heinous, atrocious or cruel" aggravator made it impossible to know whether some of the jury found the murder heinous, some atrocious, and some cruel. There, as here, the jury founded the death penalty on multiple aggravating circumstances, including the fact the killing occurred in the commission of a robbery.

¶68. The Court stated:

> [o]nly one crime -- the murder of Mrs. Johnson while in the commission of a robbery -- was considered by the jury. The list of aggravating circumstances applies only to this one crime. The issue for the jury to determine was whether the aggravating circumstances as a whole applied to the murder of Mrs. Johnson, a question they answered in the affirmative. Furthermore, the jury found two aggravating circumstances overall, that the murder was committed during the course of a robbery, and that the murder was heinous, atrocious, or cruel. Even should this Court find that the aggravating circumstance challenged here is invalid, the remaining circumstance is sufficient to uphold the death sentence.

*Shell,* 554 So. 2d at 906.

¶69. Bell's jury additionally found that the murder was committed for the purpose of avoiding lawful arrest. We find no error here, harmless or otherwise.

> **B. Instructing that the aggravating circumstance, that the capital murder was committed during the course of a robbery, could be found if the jury found Bell was an accomplice in the commission of armed robbery.**

¶70. Bell argues that S-1 is also flawed as the jury was told that it could conclude murder was committed

during the course of a robbery if it found that it was committed "while the defendant was engaged or was an accomplice in the commission or armed robbery." The vice which he finds in this instruction is that, in the guilt phase, the jury was instructed that it could find Bell guilty as an accomplice if he did any act "immediately connected with" the crime. Thus, the argument is that the jury could have found that he was merely an accessory after the fact and misapplied the aggravator. We repeat: the jury instructions must be read as a whole. Certainly, the parts of the State's sentencing instruction must be read together. In that instruction, the jury is charged, before the aggravating circumstances are listed, that they must, in order to impose the death penalty, find that Bell actually killed Bert, or that he attempted to kill him, or that he intended the killing to take place, or, finally, that he contemplated that lethal force would be employed during the commission of the robbery. There is no error in this instruction.

### C. Allowing the jury to consider the aggravating circumstance of "avoiding or preventing a lawful arrest" where the evidence did not support giving that aggravator.

¶71. This assertion merits no comment beyond an observation that Bell's own statements and actions are sufficient to warrant an inference by the jury that Bert was shot because he wanted to leave no witnesses. Bell's choice of **Leatherwood v. State**, 435 So. 2d 645 (Miss. 1983), in support of his position is a poor one. There we said that each case involving this type of instruction must be decided on its own peculiar facts, holding that:

> "[i]f there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance."

*Id.* at 651. This Court has consistently followed this holding. **Chase***,* 645 So. 2d at 857-58; **Hansen**, 592 So. 2d at 152-153.

### D. Failure to define "avoiding or preventing a lawful arrest" as an aggravating circumstance.

¶72. Bell argues that he should be granted a new trial because the instruction failed to define the avoiding arrest aggravator, saying that, without a limiting definition, the use of the "avoiding arrest" aggravator violated the Eighth and Fourteenth Amendments. In a case addressing this same issue, the Court recently held that a limiting instruction is not necessary. **Chase***,* 645 So. 2d at 858. Chase also asserted that a limiting instruction was necessary for the aggravator that capital murder was committed for the purpose of avoiding or preventing lawful arrest. The Court, in denying the necessity for a limiting instruction, quoted a Fifth Circuit case that this factor was "directed to a legitimate state interest and was 'not so broad that it comprehends an impermissibly large group of murders.'" *Id*. at 858 (*quoting* **Gray v. Lucas**, 677 F.2d 1086, 1110 (5th Cir. 1982)). As in **Chase**, Bell's jury was not unreasonable in inferring from the evidence that the murder was committed to avoid arrest. This question has been decided and the issue is without merit.

### E. S-1 is erroneous because it has a signature line only under the death option.

¶73. Instruction S-1 lists the aggravating and mitigating circumstances and the three sentencing options of death, life and unable to agree. However, the signature line for the jury foreman is under option one, the

death option. Bell argues that this instruction is seriously misleading because it could cause the jury to neglect the other two options. *Jenkins v. State*, 607 So. 2d 1171, 1180 (Miss. 1992). In *Jenkins* the Court condemned an instruction which listed the sentencing options so printed as to possibly cause the jury to overlook the lesser options. The form of the verdict for the death penalty was printed on page three, and concluded with a line designated for the foreman's signature. Page four contained options for a verdict for life, and the inability of the jury to reach a unanimous verdict as to the sentence. There was no provision for the foreman's signature following the latter options. In *Jenkins,* it was the fact that the page break in the instruction occurred after the signature line, separating the second and third options entirely, that prompted the Court to suggest that on retrial the instruction be revised to more clearly instruct the jury. The Court did not in *Jenkins* find this imperfection to be grounds for reversal. Here, the same problem does not exist, and although we continue to believe that this form should be revised for the sake of clarity, the pagination of the instruction does not separate the life imprisonment and deadlock options from the death penalty option. We do not find that this flaw rises to the level of reversible error.

### F. The instruction also allows for double-counting of the robbery aggravating circumstance.

¶74. In the guilt finding phase of the trial, the jury was instructed that a conviction of capital murder could be based on a finding that Bell unlawfully, willfully and feloniously killed Bert while engaged in armed robbery. The jury was then instructed at sentencing that it could find as an aggravating circumstance that the murder "was committed while the defendant was engaged or was an accomplice in the commission of armed robbery." Thus, Bell says, the State was allowed to double count the armed robbery, both as a ground for a capital conviction, and also as an aggravating circumstance justifying the death penalty.

¶75. He argues that a State may not constitutionally treat every unjustified intentional taking of human life as an aggravating circumstance because to do so does not narrow the class of death-eligible defendants in a principled manner. It is the proper function of the aggravating circumstances to make this distinction. The jury, under this reasoning, consequently, was allowed to convict Bell of capital murder, based on the armed robbery factor, and then to use the same armed robbery as an aggravating circumstance, thus boot-strapping all armed robberies to the death penalty level.

¶76. Bell relies primarily on *Arave v. Creech*, 507 U.S. 463 (1993), for his position. *Creech* gives two requirements for a constitutionally- valid aggravating factor. It must be determinative, not vague, and it must genuinely narrow. In other words, it must embody a principle which, standing alone, would render the death penalty proportionate to the crime. *Id.* at 474. Therefore, Bell asserts the robbery aggravating circumstance does not "genuinely narrow" because robbery-murder standing alone is not a crime for which the death penalty is proportionate punishment, and is thus violative of the Eighth Amendment to the United States Constitution and Article 3, Section 28 of the Mississippi Constitution.

¶77. We have previously rejected this argument. *See Ladner v. State*, 584 So. 2d 743, 762 (Miss. 1991) [(4)](); *Minnick v. State*, 551 So. 2d 77, 96-7 (Miss. 1988), *rev'd on other grounds*, 498 U.S. 146 (1990). *Ladner* and *Minnick* expressly rejected the stacking argument based on the United States Supreme Court ruling in *Lowenfield v. Phelps*, 484 U.S. 231 (1988). The *Minnick* Court stated that *Lowenfield* "held that the fact that the sole aggravating circumstance found by the jury in its penalty decision was identical to an element of the underlying offense did not violate the Eighth Amendment." *Minnick,* 551 So. 2d at 97. Accordingly, the lower court should not be held in error on this point.

### G. Instruction S-1 should not have been granted because it fails to require the jury to make

**specific written findings of mitigating circumstances.**

¶78. Section 99-19-101(3) (1994) of the Code provides that the determination of the jury to impose death shall be supported by specific written findings that there exists sufficient aggravating circumstances as those factors are listed in subsection five of the statute, and that there are insufficient mitigating circumstances as those are set out in subsection six. Bell tells us that the failure of the instruction here to require written findings of mitigation calls for reversal of the sentence.

¶79. "This Court has never read Miss. Code Ann. §§ 99-19-101, et seq., as requiring an express written list of all the mitigating circumstances which members of the jury may find extant." *Conner,* 632 So. 2d at 1277. The Court there reasoned that the law does not require a consensus among the jury members regarding mitigating factors. Thus, "listing the jury's findings on such factors would often prove impracticable." *Id.* at 1278. Indeed, to do so may be said to undesirably limit the jury's ability to give the defendant the benefit of all of those factors.

> **H. Instruction S-1 was erroneously granted because it tells the jury that the mitigating circumstances must outweigh the aggravating circumstances in order to impose a life sentence.**

¶80. Bell next complains that S-1 tells the jury that in order to impose a life sentence they must find that the mitigating circumstances outweigh the aggravating circumstances, although under law the jury may impose a life sentence regardless of its weighing of the aggravating and mitigating circumstances. He argues that the instruction also shifts the burden to the defendant, requiring him to show that the mitigating evidence outweighed the aggravating. He cites *Shell v. State* for the proposition that not only does a defendant not have to show that the mitigating circumstances outweigh the aggravating circumstances, but also that "[e]very mandatory element of proof is assigned to the prosecution." *Shell* 554 So. 2d at 904 (*quoting Gray v. Lucas,* 677 F.2d 1086, 1105-06 (5th Cir. 1982)). The language to which Bell objects is, specifically:

> [i]f you find [from] the evidence that one or more of the preceding elements of mitigation exist, then you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstances you previously found. In the event that you find that the mitigating circumstances(s) do not outweigh or overcome the aggravating circumstances(s), you *may* impose the death sentence. Should you find that the mitigating circumstance(s) outweigh(s) or overcome(s) the aggravating circumstance(s) you shall not impose the death sentence. [emphasis added.]

¶81. In *Shell* the instruction provided that in order to return the death penalty, the jury must conclude "that the mitigating circumstances . . . do not outweigh the aggravating circumstances," and was found acceptable. *Id.* The phrasing, "that the mitigating circumstances do not outweigh or overcome the aggravating circumstances," is drawn from and consistent with the language of our death penalty statute, Miss. Code Ann. § 99-19-101. As we observed in *Shell*, the Fifth Circuit reviewed our statute in *Gray v. Lucas*, 677 F. 2d 1086, 1105-06 (5th Cir. 1982), concluding that under that statute "[n]either the burden of production nor of proof ever shifts" from the State. Most recently, in *Conner v. State, supra*, we rejected Bell's present argument where we were asked to review essentially the same instruction. *Conner,* 632 So. 2d at 1271-72. This argument is wholly without merit.

### XVIII. THE DENIAL OF INSTRUCTION DS-7

¶82. Bell argues that the judge's error as to the last point, that the court improperly shifted the burden, was compounded by the trial court's failure to give DS-7, instructing the jury that it must find beyond a reasonable doubt "that the aggravating circumstances outweigh the mitigating." The trial court refused this and other sentencing instructions finding them to be redundant to those given. Again, Bell failed to object to the rejection of this instruction, and the issue is barred under *Gollott, Foster* and *Chase, supra.*

¶83. Bell's offered instruction stated, "[b]efore you may consider imposing the death sentence, each one of you must be convinced beyond a reasonable doubt that the totality of the aggravating circumstances outweigh the totality of the mitigating circumstances. . . ." The court's instruction stated, "[t]o return the death penalty you must find that the mitigating circumstances . . . do not outweigh the aggravating circumstances."

¶84. The court's instruction correctly and clearly states the requirements of the statute, as we noted above. It is neither required nor appropriate that additional redundant instructions be given. There is no error in the refusal of instruction DS-7.

## XIX. UNCERTAINTY AND UNRELIABILITY OF SENTENCING PHASE FINDINGS

¶85. At sentencing, the jury was instructed that before it could impose the death penalty it must find at least one of four possible factors: that Bell actually killed, attempted to kill, intended that a killing take place, or he contemplated the use of lethal force. The jury found all four to exist.

¶86. Bell argues that the jury's verdict is suspect because of the erroneous instructions in the guilt phase on accomplice liability, which allowed conviction without a finding of intent by Bell. He complains that the instruction allowed conviction if Bell did anything "connected with" the crime, arguing in his brief that the United States Constitution requires that before the death penalty may be imposed:

> "the focus [must] be on *his* culpability, not on that of those who committed the robbery and shot the victims, for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence.'" *Enmund v. Florida*, supra, 458 U.S., at 798, [citation omitted] (emphasis in original).

*Tison v. Arizona*, 481 U.S. 137 (1987).

¶87. Here, Bell essentially reiterates the same argument which he made as to the guilt phase instructions, and which we have already addressed and found wanting. Further, the jury positively found Bell guilty under § 99-19-107(c), intending that a killing take place and under § 99-19-107(d), contemplating that lethal force would be employed. We are satisfied that the *Enmund* standard was achieved and that a reliable verdict was rendered

## XX. THE STATE'S ARGUMENT AT SENTENCING

¶88. Following the testimony in the sentencing phase of this trial, the State made a very brief argument to the jury, an argument that in total, both the initial statement and rebuttal covers only five pages of the trial transcript. Bell finds in that summation an accumulation of proscribed statements which, taken as a whole, must, in his opinion, lead to reversal of the sentence.

¶89. Again, we must point out that errors which may have occurred in this area are available to Bell only if

they are so egregious as to be plain error, for he made no contemporaneous objection during that argument. *Foster* 639 So. 2d 1263, 1288-89 (Miss. 1994); *Chase* 645 So. 2d at 852-53. In *Johnson v. State*, 477 So. 2d 196, 209-10 (Miss. 1985), we said clearly that:

> [I]t is the duty of a trial counsel, if he deems opposing counsel overstepping the wide range of authorized argument, to promptly make objections and insist upon a ruling by the trial court. The trial judge first determines if the objection should be sustained or overruled. If the argument is improper, and the objection is sustained, it is the further duty of trial counsel to move for a mistrial. The circuit judge is in the best position to weigh the consequences of the objectionable argument, and unless serious and irreparable damage has been done, admonish the jury then and there to disregard the improper comment . [citations omitted.]

¶90. He sees some statements as illicit expressions of personal opinion by the prosecutor. The district attorney said that the State was seeking the death penalty because "we felt like it's the only appropriate penalty," and said that he would tell the jury "why I think" it should be imposed. He declared that, "I don't see any [good in Frederick Bell], and " I don't see any at all that would take two lives--, just cold-bloodedly kill two people." Bell points to other statements in which the prosecutor argued that the commission of the second murder in Memphis demonstrates a lack of remorse on Bell's part, and said that Bell's demonstration to James and Coffey of how he put two bullets in Bert's head showed that he was proud of killing Bert. The prosecutor, commenting on the testimony of Bell's mother, said that the death penalty was "the only thing that can stop" Bell's killing of others. Bell complains that, by the latter statement, the State impermissibly urged the death penalty because of a propensity of Bell to commit future murders, a matter which, of course, is not one of the statutory aggravating factors. Then, Bell argues, the prosecutor improperly commented on the specifics of the Memphis crime, while the law allows only the fact of another crime to go to the jury on sentencing.

¶91. It has been held that a prosecutor may not use his personal beliefs and the prestige attendant to his office to bolster his argument or the witnesses or evidence which he deems most damaging to a defendant. *United States v. Young*, 470 U.S. 1, 5 (1985); *Dunaway v. State*, 551 So. 2d 162, 164 (Miss. 1989); *Tubb v. State*, 217 Miss. 741, 745, 64 So. 2d 911 (1953). He is, however, entitled to argue his case drawing all rational inferences which come from the evidence presented in the courtroom. *Davis*, 684 So. 2d at 656 (*quoting Shell*, 554 So. 2d at 900.) Bell's argument is similar to that made by the prosecutor in *Chase*, where we found statements such as "I think that Terry Washington told you the truth about everything she knew. I don't think she tried to hold anything back," and "I believe that I have proved to you beyond a reasonable doubt . . . that that man . . . shows absolutely no remorse," to be permissible deductions drawn from the evidence. *Chase* 645 So. 2d at 855. Such deductions are to be distinguished from personal opinions which are not drawn from the evidence at trial. We cannot say that by introducing these observations with phrases such as "I think," or "we believe," the State spoils otherwise acceptable argument. *See Knox v. State*, 502 So. 2d 672, 675 (Miss. 1987).

¶92. Bell directs our attention to authorities which limit the admissibility of evidence of another crime to the fact that the crime and conviction occurred, and complains about argument regarding the cold-blooded nature of that crime. However, here, the prosecutor offered no proof on the Tennessee conviction beyond its existence and the fact that it was for second degree murder. It was Bell himself who chose, from the witness stand under direct examination, to comment on the details of the crime. The State's argument in this area was nothing more than a comment on Bell's unwise effort to minimize its nature and circumstances. In

adducing that Bell's conduct following Bert's death evinced a lack of remorse, the prosecutor was drawing on Bell's statement, while continuing in the sentencing phase to deny that he killed Bert, that he was sorry that Bert was killed. This argument was not an effort to interject an additional, non-statutory aggravator, nor was it a comment on a defendant's failure to testify, a tactic condemned in *Reed v. State*, 197 So. 2d 811 (Miss. 1967). It was simply fair commentary on behavior and testimony by Bell which was in evidence. *See Davis v. State*, 660 So. 2d 1228, 1250 (Miss. 1995); *Knox* 502 So. 2d at 675.

¶93. Regarding what he perceives as argument by the State of an unapproved aggravating circumstance, i.e., propensity to kill again, Bell relies on *Balfour v. State*, 598 So. 2d 731 (Miss. 1992). *Balfour* has no application here, as that case dealt with the admissibility of evidence whereby the State attempted, repeatedly, to prove that Balfour was likely to kill again. In *Coleman v. State*, 378 So. 2d 640, 648 (Miss. 1979), we likewise held that aggravating circumstances are limited to the eight statutory circumstances.

¶94. In the present case, Bell's mother testified on her son's behalf. In that testimony she asked, perhaps rhetorically: "What [do] you [the prosecutor] think that will stop this." Commenting on that testimony, the prosecutor said to the jury: "His mother asked the question up here, 'what would stop it.' There's only one thing that can stop it, and I think ya'll know what that it; that's coming back with the death penalty." If the prosecution transgressed the limits, it was by this argument, not by evidence as in *Balfour*. Bell directs our attention to *Reed v. State*, 232 Miss. 432, 99 So. 2d 455 (1958), as authority condemning mention of the possibility of future criminal acts in argument. However, *Reed*, in which two black men were prosecuted for robbery, stands for the proposition that the prosecutor will not be allowed to appeal to racial prejudice with the argument that "'[i]f you don't stop them now, they will next be robbing white people.'" *Id.* at 434, 99 So. 2d at 456.

¶95. In recognition of the fact that future dangerousness bears on all sentencing determinations, the United States Supreme Court has approved consideration by juries of that factor. *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994) (under a statute, like ours, in which future dangerousness is not a statutory aggravating circumstance); *Jurek v. Texas*, 428 U.S. 262, 275 (1976). Thus, although the State may not offer evidence of future dangerous propensity, beyond that implicit in the statutory aggravators, e.g., murder committed during a robbery and prior conviction of a crime of violence, there is no Fourteenth or Sixth Amendment injunction against argument of such propensity, if such argument does not appeal to bias and passions and may be said to be a reasonable inference and comment on the evidence produced by both sides.

¶96. Bell's assignments as to the prosecution's arguments are both procedurally barred and without merit.

### XXI. THE BAD CHARACTER EVIDENCE

¶97. The Chief of Police in Calhoun City testified during the sentencing phase that his opinion of Bell's reputation in the community for peace and violence was bad. Likewise, a member of the Calhoun County Sheriff's Department testified that his opinion that the reputation of Bell for peace and violence was bad. Bell asserts that this is error because the witnesses were not asked to testify to Bell's "general reputation in the community in which he lived" and because his character had not been put in issue. In fact, Bell did put his character in issue by placing witnesses on the stand to testify that he was not violent and that he would not hurt anyone who did not first "do something to him." The officers were allowed to testify in rebuttal to their opinions of Bell's reputation in his community for peace and violence; and their opinions were that Bell

had a bad reputation for peace and violence. Under Miss. R. Evid. 404(a)(1), evidence of the character of the accused may be offered in rebuttal to his own evidence of good character, and we have explicitly held that once a defendant places his character in issue in the penalty phase, the State can then rebut the evidence of the defendant. ***Davis v. State***, 660 So. 2d 1228, 1253 (Miss. 1995). Rule 405(a) clearly allows evidence of character "by testimony as to reputation ***or by testimony in the form of an opinion***." [Emphasis supplied.] The comment to the Rule states clearly that, "[r]ecognizing that reputation evidence is nothing more than the opinion of a selected group, Rule 405 broadens the methodology to allow proof of character by opinion."

¶98. There is no error here.

## XXII. STATE'S EXHIBIT SP-1

¶99. Before the penalty phase of the testimony began, the Court met in chambers with counsel to discuss preliminary matters. The State had documents evidencing the Tennessee conviction, consisting of the indictment, the judgment and a certificate authenticating those items. Bell's lawyer objected to these items and any testimony on the subject, arguing that the Memphis crime occurred after, not prior to, the killing of Bert in Grenada County. During this conversation, there was no discussion of the fact that the indictment or any of these documents showed that the initial indictment charged murder in the first degree. Bell's objections to these documents and to the testimony related to the Memphis crime addressed the time of this event, which occurred on the same day as the Grenada County crime. As his attorney said, "[M]y objection would be with respect to the time frame of that deed." His argument had two prongs. First, he argued that the statutory aggravator only allowed the jury to consider violent crimes committed prior to the one charged. The judge overruled this objection. Second, he argued that the Tennessee judgment and the associated testimony could lead the jury to believe that, since the crimes were committed on the same day, the Memphis crime was committed first. After some further discussion, both on and off the record, the following is recorded:

> BY THE COURT: The Defendant still vigorously objects to any testimony about the time frame for the offense that occurred in Memphis, but counsel for both sides agree that the Court has made its ruling that this judgment has been properly authenticated, but, however, believes, and ***counsel agree, that there is no purpose served by sending back with the jurors in this case a copy of the indictment*** in this case. Therefore, the indictment will be removed and only the authentication, certification and the judgment will be sent to the jury. ***Is this by agreement?***

> BY MR. JONES [defense counsel]: With respect to Tennessee.

> BY THE COURT: With respect to the Tennessee, but with the objection as to Mr. Coffey's [testimony], and your other objection preserved as well, but only to the method of presentation.

> BY MR. JONES: ***Yes, sir***.

[Emphasis supplied.]

¶100. Then, the certification and the judgment were marked for identification. Thereafter, the judge admitted these two exhibits, the certificate and the judgment, into evidence "with the objections that were offered in chambers preserved for the record." No further objections were made as to their admissibility.

¶101. So far as the record reflects, the indictment for first degree murder was not offered or admitted. Bell now argues that the certificate should have been excluded because, authenticating both the indictment and the judgment, it contains a reference to the first degree charge in the indictment. However, Bell not only failed to object on this ground, he in fact stipulated and agreed to the admissibility of the certificate, subject only to the objections relating to the time of the crime, and possibly the manner of presentation. This objection is clearly procedurally barred. *Conner* 632 So. 2d at 1255.

## XXIII. REFUSAL OF INSTRUCTIONS D-6 AND D-7

¶102. Bell offered instructions advising the jury that they need not be unanimous on their evaluation of mitigating factors, and he argues that without them the jury was not sufficiently informed as to its consideration of these mitigating circumstances, especially in view of the repeated emphasis in other instructions that the verdict and findings of the aggravating circumstances must be unanimous. This argument has already been rejected by the Court. *Blue v. State*, 674 So. 2d 1184, 1226 (Miss. 1996); *Chase*, 645 So. 2d at 860; *Hansen*, 592 So. 2d at 149-50; and *Shell*, 554 So. 2d at 905. Bell urges us to adopt the position chosen by North Carolina. In *State v. McNeil*, 395 S.E.2d 106, 109 (N.C. 1990), although the trial court there never explicitly stated that the mitigating circumstances had to be unanimous, the trial judge did indicate that the jury's determinations had to be unanimous. The Court held that even without an express unanimity requirement the instructions gave rise to a reasonable likelihood that some of the jurors were prevented from considering constitutionally-relevant evidence. We have considered and rejected this line. *Blue,* 674 So. 2d at 1226; *Conner,* 632 So. 2d at 1272; *Hansen,* 592 So. 2d at 149-50. There is no merit to Bell's argument.

## XXIV. INSTRUCTION S-1 AND "NON-STATUTORY AGGRAVATORS"

¶103. Here, it is argued that the trial court erred by instructing the jury in S-1 that it could "consider the detailed circumstances of the offense for which the defendant was convicted, and the character and record of the defendant himself." Bell says that this instruction allowed the jury to consider non-statutory factors in the aggravation of the death penalty, and that this problem was compounded by S-3 which told the jury that it must apply reasoned judgment in its determination of life or death in light of the totality of the circumstances present. We have held that the jury can consider only the eight statutory aggravating circumstances listed in Miss .Code Ann. § 99-19-101 (Supp. 1994), in deciding whether to impose the death sentence. *Balfour*, 598 So. 2d at 747-48. We continue to adhere to that rule which prevents the creation of additional factors by prosecutors. However, this limitation does not prohibit the careful consideration of the facts developed and presented to the jury or the use of reason and judgment in assessing those circumstances. To do so would be absurd, and to instruct the jury of its duty to exercise such judgment and care simply cannot be called error. In *Tuilaepa v. California*, 512 U.S. 967 (1994), the defendant challenged the jury instruction issued by a California court instructing the jury that it could consider the circumstances of the crime and the defendant's prior criminal activity. The Court held that the "circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence."*Tuilaepa*, 512 U.S. at 976. In *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), consideration of the circumstances of an offense was characterized as constitutionally indispensable to a death sentence. The instruction given here was a sensible and clear expression of the jury's duty and cannot be read as interjecting unwarranted aggravating factors or allowing the jury to venture out on a hunt for other justification for ordering Bell's death.

## XXV. THE ANTI-SYMPATHY INSTRUCTION AND REFUSAL OF BELL'S MERCY INSTRUCTION

¶104. The trial judge instructed the jury in its determination of life or death "[N]ot to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." Bell argues that this instruction precluded the jury from giving a reasoned moral response to his mitigating evidence in deciding whether to impose the death penalty in violation of the Eighth and Fourteenth Amendments and their Mississippi counterparts, and that the trial court further erred by not giving a mercy instruction. The State argues correctly that these matters are procedurally barred because Bell did not object to the Court's instruction to which he now takes exception. *Willie v. State*, 585 So. 2d 660, 677 (Miss. 1991). Alternatively, the State asserts, again correctly, that the issue of an anti-sympathy instruction was decided adversely to the accused in *Willie*. The instruction in *Willie* was essentially identical to that in the present case. In *Willie*, the Court found the argument unmeritorious in light of the holdings of the United States Supreme Court supporting the use of anti-sympathy language. *Id*. *See California v. Brown*, 479 U. S. 538 (1987).

¶105. In support of his entitlement to a mercy instruction, he quotes the following passage from *Wiley v. State*, 484 So. 2d 339, 349 (Miss. 1986), in which the Court stated that giving a mercy instruction "[W]ould further refine and direct the jury's discretion in sentencing between those cases in which the death penalty is given and those in which it is not." However, Bell apparently overlooks the Court's statement in the same sentence from which he quotes that "this Court has held that no reversible error is committed in refusing a mercy instruction . . . ." *Id*. Furthermore, the case law is clear that there is no entitlement to a mercy instruction. *Foster*, 639 So. 2d at 1300-01; *Jenkins*, 607 So. 2d at 1181; *Ladner*, 584 So. 2d at 761; *Wiley*, 484 So. 2d at 349.

## XXVI. FAILURE TO INSTRUCT JURY ON EFFECT OF TENNESSEE SENTENCE ON A LIFE SENTENCE IN THIS CASE

¶106. The jury was given the options of sentencing Bell to death or to life imprisonment.[5] Bell now argues that the trial court should have informed the jury that if Bell was sentenced to life imprisonment, he would only begin to serve that sentence after completion of his Tennessee sentence, and that this instruction is particularly important in view of what Bell perceives to be the State's argument of future dangerousness. Of course, as we have pointed out above, the State did not in fact argue, as an additional aggravating circumstance, that propensity, but rather argued his violent nature, in a most limited way, as a response to evidence offered on behalf of Bell through his mother.

¶107. We note that Bell does not argue that he was prohibited from placing evidence on this matter before the jury, that he was limited in his summation, or that he was denied an instruction in this area. Nor does he suggest that the trial judge erroneously overruled any objection to the sentencing instructions made on this ground. His argument is that the court committed plain error in failing to so instruct the jury, *sua sponte*. Of course, under these circumstances and the cases cited above, unless there is error and it is of such nature and degree as to constitute plain error, this argument is procedurally barred.

¶108. Because Bell sought no such instruction, and the State did not attempt to argue on the point, we are left to wonder what Bell's argument would have been if in fact the jury had been instructed that in deciding between life and death it was to consider the length of not only a Mississippi life sentence but also the length

of the Tennessee sentence and the time that Bell would actually serve under each, and if the State had then argued the effect of the possibility of parole.

¶109. *Williams v. State*, 445 So. 2d 798 (Miss. 1984), is instructive. There, the defendant, having been convicted of capital murder while engaged in an armed robbery, was sentenced to death. During the trial, the prosecutor elicited testimony on cross-examination of the defendant's expert, which tended to show that one sentenced to life imprisonment could expect to serve a term of not more than thirty years. Reversing, we said that "[a] jury should have no concern with the quantum of punishment because it subverts a proper determination of the sentencing issue," and expressly condemned placing the issue of parole before the jury. *Id*. at 813.

¶110. Bell relies on *Turner v. State*, 573 So. 2d 657 (Miss. 1990), for this proposition. However, Turner was indicted and tried as an habitual offender, and, if convicted as such, would have had no possibility of parole. There, the status hearing on the habitual offender status was not conducted prior to the sentencing hearing, and Turner, unlike Bell, presented an instruction advising the jury that if sentenced to life imprisonment, he would never be eligible for parole. Our holding in Turner was that in such cases, the status hearing should be conducted prior to sentencing. We then said:

> At the sentencing phase, the jury *shall be* entitled to know by instruction whether the defendant is eligible for parole. . . . Providing juries with such *non*-speculative information would be compliant with the dictates of logic and constitutional principles of due process and fundamental fairness. In other words, the procedure would meet the "essential" requirement that juries have before them "*all* possible relevant information about the individual defendant whose fate it must determine."

*Id.* at 675 (citations omitted; emphasis in original).

¶111. In *Blue v. State*, *supra,* the defendant was tried for capital murder, but not as an habitual offender. There, the jury sent out a note asking for a definition of life imprisonment. The State said that the jury should be told that it meant ten years, and Blue objected to any response beyond the original instructions. The judge responded saying that "'the law will not allow me to define 'life imprisonment' for you.'" *Blue*, 674 So. 2d at 1194. Thereafter, on appeal, Blue argued that the jury did not know the meaning of the term, and that he should have been allowed to tell the jury that it meant that he would serve thirty years in prison and that his trial lawyer's failure to request such an instruction was ineffective assistance. Finding that Blue was not entitled to such an instruction, we said:

> We hold that the case *sub judice* is controlled by *[Walter] Williams v. State*, 445 So. 2d 798 (Miss. 1984), in which the defendant convicted of capital murder was not a habitual offender. In *Williams,* this Court reasoned that as parole is not automatic, "[a]llowing argument or testimony regarding the possibility of the defendant some day being paroled is in effect inviting the jury to speculate how *ten years in the future* [or thirty years as the case may be in the present case] the parole board may exercise its legislatively granted discretionary authority." 445 So. 2d at 813. *See also [Jessie Derrell] Williams v. State*, 544 So. 2d 782, 798 (Miss. 1987). Because such discussion of parole is merely speculative, it would "introduce into the sentencing proceedings an 'arbitrary factor' proscribed by § 99-19-105(3)(a)." *Williams*, 445 So. 2d at 813. *See also Williams*, 544 So. 2d at 799. In fact, in *Mackbee*, 575 So. 2d at 40, this Court clearly held that the one exception to the rule forbidding jury consideration of parole issues is when a defendant is sentenced as a habitual offender under § 99-19-83. This Court reasoned that this is so because such

defendants are not eligible for parole, and thus, their fate under a life imprisonment sentence is non-speculative.

***Blue*** at 1196.

¶112. In ***Simmons v. South Carolina***, *supra,* decided after Bell's trial, the United States Supreme Court held that in a case in which propensity for future dangerous conduct is argued as a factor, and a sentence to life imprisonment without the possibility of parole is an option for the jury, the defendant is entitled to have the jury instructed that the life sentence will in fact preclude that possibility. There, the defendant requested an instruction, but it was refused and the Court instead instructed the jury that it was not to consider parole in sentencing. Recently, in ***U. S. v. Chandler***, 950 F. Supp. 1545 (N.D. Ala. 1996), the district court had the opportunity to consider the application of ***Simmons*** in a federal setting. Chandler argued that under ***Simmons***, he was entitled to have the jury instructed on the fact that if not sentenced to death, he would serve his life sentence without the possibility of parole. The district court found ***Simmons*** inapplicable, distinguishing that case, in which the defendant's future dangerousness was said to have been argued as a sentencing criterion, from Chandler's in which, like Bell's, the only references to his dangerous propensities were made in argument responding to the defendant's evidence and argument, saying: "Because the government did not place Chandler's future dangerousness into issue at the sentencing hearing, ***Simmons*** does not apply here." *Id.* at 1578.

*¶113.* We find this point procedurally barred and substantively without merit.

## XXVII. PROPORTIONALITY

*¶114.* We have, as is our duty, carefully subjected this case to a review to determine whether the sentence here is in any way disproportionate or excessive when compared to the penalty imposed in similar cases since the decision in ***Jackson v. State***, 337 So. 2d 1242 (Miss. 1976), and we find that it is not.

¶115. Here, the jury found that Bell intended to, attempted to, and did actually kill Bert during the commission of an armed robbery in which he contemplated the use of lethal force. They were aware that he had killed another prior to trial. When given the opportunity, Bell offered no real mitigating circumstances, he simply continued to deny being present or committing the act. The jury had before it evidence that Bell actually fired at least some of the fatal shots. There are no indications that Bell suffered from any mental or emotional deficiency.

¶116. Bell suggests that ***Bullock v. State***, 525 So. 2d 764 (Miss. 1987), and ***Reddix v. State***, 547 So. 2d 792 (Miss. 1989), compel us to set aside the sentence here. But the cases simply are not comparable to the present one. In ***Reddix***, the sentence was found disproportionate specifically because of the mental deficiencies of the defendant and the fact that the actual killing was done by another, with Reddix doing nothing to assist in the assault. Furthermore, the Court had serious doubt as to whether Reddix intended to kill or contemplated the use of lethal force during the robbery. ***Reddix,*** 547 So. 2d at 794-95. In ***Bullock***, a five-to-four decision, the sentence was set at life imprisonment, with three justices finding death to be disproportionate. There, too, Bullock's accomplice was the actual killer and Bullock had received the death penalty solely on the grounds that the use of lethal force was contemplated. The three members of the Court finding the death penalty disproportionate concluded that Bullock neither killed nor attempted to kill the victim, and said that "we have not affirmed a single death penalty where the defendant's participation in the crime was as insubstantial as in Bullock's case." ***Bullock,*** 525 So. 2d at 770. It is

impossible to conclude that Bell's participation in the death of Bert was likewise insubstantial.

## CONCLUSION

¶117. We have considered all the errors suggested by Frederick Bell, and we have independently reviewed this case under the mandate of Miss. Code Ann. § 99-19-105(3). We find that the errors assigned are without merit, and, in the instances so indicated in our consideration of each of them, procedurally barred. We further find that the sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor; that the jury's findings of the statutory aggravating circumstances are supported by the evidence; and that the sentence is neither excessive nor disproportionate. Frederick Bell and Anthony Joe Doss entered the country store where Bert Bell worked fully intending to use lethal force in robbing it. There was sufficient evidence to allow the jury to conclude that they deliberately and unnecessarily took Bert's life during that robbery. We find, under these circumstances, no reason to reverse the trial court either on the issues of guilt or punishment.

¶118. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7)(SUPP. 1995) AND M.R.A.P. 41(a).**

**PRATHER, C.J., SULLIVAN, P.J., ROBERTS, SMITH AND MILLS, JJ., CONCUR. BANKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, J. WALLER, J., NOT PARTICIPATING.**

**BANKS, JUSTICE, DISSENTING:**

¶119. The majority here concludes that the circuit judge did not abuse his discretion in refusing to dismiss for cause panel members Burns, Cook, Haley, Leverette and Sheffield. I agree with this result as to panel member Cook, as there is no inherent difficulty in seating on a jury a law enforcement officer or the relative of an officer. *See Mhoon v. State,* 464 So. 2d 77, 81 (Miss. 1985). The other four disputed panel members, however, had personal connections with the deceased or his family. As I believe that the circuit court erred in declining to excuse these panel members for cause, I respectfully dissent.

¶120. Since I am of the view that these panel members should have been stricken for cause, and that Bell was forced to use peremptory challenges to remove them, the question arises as to whether Bell received a trial by a fair and impartial jury. Our law, of course, requires that before an appellant may challenge a trial court's refusal to excuse a juror for cause, he must show that he utilized all of his peremptory challenges. *See, e.g., Hansen v. State,* 592 So. 2d 114, 129 (Miss. 1991); *Berry v. State,* 575 So. 2d 1, 9 (Miss.1990); *Chisolm v. State,* 529 So. 2d 635, 639 (Miss. 1988); *Johnson v. State,* 512 So. 2d 1246, 1255 (Miss. 1987); *Billiot v. State,* 454 So. 2d, 445, 457 (Miss. 1984). This Court articulated the rationale for this rule in *Hansen*:

> The reason for the rule is that the appellant has the power to cure substantially any error so long as he has remaining unused peremptory challenges. We would put the integrity of the trial process at risk were we to allow a litigant to refrain from using his peremptory challenges and, suffering an adverse

verdict at trial, secure reversal on appeal on grounds that the Circuit Court did not do what appellant wholly had power to do.

*Hansen,* 592 So. 2d at 129-30.

¶121. The effect of this rule is to *require* the defendant, where he disagrees with the trial court's denials of challenges for cause, to utilize his peremptory challenges to strike the disputed panel members from the jury. In addition to exhausting his peremptory challenges, the defendant must also show that an incompetent juror was forced by the trial court's erroneous ruling to sit on the jury. *See, e.g., Mettetal v. State,* 602 So. 2d 864, 869 (Miss. 1992); *Chisolm,* 529 So. 2d at 639.

¶122. In the present case, Bell exhausted his peremptory challenges in striking panel members whom the trial judge, in my view, improperly failed to excuse for cause. It is also apparent that the jury which ultimately sat was composed of many members whom the defendant would likely have struck had he had remaining challenges. Of the twelve jurors who sat, two were acquaintances with the deceased or his parents. Five had connections to law enforcement.

¶123. The question should not be limited to whether the jury which actually hears the case is facially impartial. Where the process of selecting an impartial jury which we have statutorily ordained is wrongfully skewed to deprive a litigant of a full complement of peremptory challenges, the question should be whether the errors have made the process so demonstrably unfair as to deprive the litigant of a jury composed of a true cross-section of the community and of due process and equal protection of the law.

¶124. No one would argue in a capital case that the prosecution should receive twelve peremptory challenges and the defendant none. How can we claim that jurors randomly drawn and screened for cause should be put through an additional sifter for one side and not the other? The justification for the retention of peremptory challenges as an integral part of our jury selection system is that the screening process is imperfect and that in order to arrive at a truly impartial jury, peremptory challenges should be retained.

> The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. In this way the peremptory satisfies the rule that "to perform its high function in the best way 'justice must satisfy the appearance of justice.'"

*Swain v. Alabama,* 380 U.S. 202, 219 (1965), *overruled on other grounds by Batson v. Kentucky,* 476 U.S. 79 (1986).

¶125. As the United States Supreme Court recognized in *Ross v. Oklahoma*, 487 U.S. 81 (1988), the prospect of a court deliberately depriving a litigant of peremptory challenges by repeatedly misapplying the law may run afoul of the United States Constitution. *Id.* at 487 U.S. at 91 n.5. Such a practice certainly offends our statutory scheme of providing an equal number of challenges to the state and the defendant. While an isolated instance of error depriving one of a peremptory challenge can be tolerated, the wholesale refusal to grant challenges for cause that are clearly warranted should not.

¶126. In the instant case, one involving the death penalty where every procedural step should be assessed with the greatest of care, a number of challenges for cause were rejected which, in my view, amounted to an abuse of discretion. As the majority notes, panel member Haley had a business relationship with the victim's father. The victim's father, upon hearing that Haley was a potential juror, had remarked to him, "[w]

ell, we need good jurors." Panel member Leverette's wife knew the victim's mother through work, and he went to the same church as the victim. Leverette stated that he had sent a sympathy card to the family after the murder. Panel member Sheffield had done business with the victim's father for twenty-five years and they had hunted together. Panel member Burns, the wife of a retired police officer, worked with the victim's mother for six months.

¶127. While all of these jurors, sometimes in response to coaxing by the trial court, claimed they could be fair and impartial, the heightened scrutiny that we give death penalty cases dictates jurors in these circumstances be removed for cause. Because they were not, I would reverse this conviction and sentence.

**McRAE, J., JOINS THIS OPINION.**

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Doss v. State,* --- So. 2d --- (Miss. 1997).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1123 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987)*, Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating

and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).


## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court,case was remanded by this Court for a new sentencing hearing.


## DEATH CASES REVERSED AS TO GUILT PHASE

### AND SENTENCE PHASE

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).


## DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

### (**continued**)


*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED

## AS TO PUNISHMENT AND REMANDED

## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

## DEATH CASES REVERSED AS TO

**PUNISHMENT AND REMANDED FOR A NEW TRIAL**

**ON SENTENCING PHASE ONLY**

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (Miss. 1996)

**DEATH CASES REVERSED AS TO**

**PUNISHMENT AND REMANDED FOR A NEW TRIAL**

**ON SENTENCING PHASE ONLY**

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

1. Frederick Bell and Bert Bell are unrelated. For clarity, they are distinguished in this opinion by the use of Bert Bell's given name.

2. In this testimony, James expressed the opinion that, "[h]e was probably going to kill me right then." Bell's attorney objected to this statement, and the judge sustained the objection and admonished the jury to disregard it.

3. Officer Grantham did testify to this. However, even if the comments on how mean Bell was were improper, they do not justify reversal. The standard " is whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by prejudice so created. *Ormond v. State*, 599 So. 2d 951, 961 (Miss. 1992)(*quoting Davis v. State*, 530 So. 2d 694, 701 (Miss. 1988)). Those comments here do not approach such a profound effect.

4. *Ladner* was modified in *Willie v. State*, 585 So. 2d 660, 680-81 (Miss. 1991), overruling those prior cases permitting the use of robbery and pecuniary gain as aggravators together to prohibit the conjunctive use of these aggravators. Bell does not make this argument.

5. Miss. Code Ann. § 99-19-101(Supp. 1993), at the time of Bell's trial provided only for a sentence of life imprisonment or death; it was only later, in 1994, that it was amended to add the third possibility of life without the possibility of parole. Furthermore, Bell was not tried under the habitual offender statutes.